**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------x

| | |
|---|---|
| **TAYLOR PRECISION PRODUCTS, INC.,** | : |
| | : |
| Plaintiff, | : |
| | : |
| -against- | : |
| | : |
| **THE LARIMER GROUP, INC. f/k/a** | : |
| **METROKANE, INC., JOEL GROSSMAN,** | : |
| **and RIKI KANE,** *individually and as executrix* | : |
| *of the will of* **ROBERT LARIMER,** | : |
| | : |
| Defendants. | : |
| | : |

----------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: __2/4/2022__

**1:15-cv-4428 (ALC)**

<u>**FINDINGS OF FACT AND**</u>
<u>**CONCLUSIONS OF LAW**</u>

**ANDREW L. CARTER, JR., United States District Judge:**

## SYLLABUS

Taylor Precision Products, Inc. ("Taylor" or "Plaintiff") commenced this action against

Larimer Group, Inc. f/k/a Metrokane, Inc. ("Metrokane"), Joel Grossman, and Riki Kane,

individually and as the executrix of the will of Robert Larimer (collectively, "Defendants"),

alleging that Defendants failed to sufficiently disclose adverse information reflecting the strength

of Metrokane's business during negotiations for Taylor's acquisition of Metrokane's assets in

2013. Specifically, Plaintiff asserts that Metrokane omitted crucial information and

misrepresented the health of Metrokane's relationships with Walmart and Target despite a

contractual obligation to disclose this information—information vital to Plaintiff's valuation of

Metrokane's assets. Taylor alleges that the misinformation allowed Metrokane to close the deal

at a higher asking price than Metrokane's business was worth because Metrokane's relationships

with Target and Walmart had soured by the time of closing. Taylor claims that Metrokane's

failure to disclose the true state of the relationships with Target and Walmart amounts to breach

of contract, fraud, willful misconduct and gross negligence, and requests that this Court remedy Defendants' unjust enrichment. Defendants counter by painting a picture of protracted and detailed negotiations during which Plaintiff obtained no shortage of due diligence and Defendants acquiesced to every request. The Parties' quarrel led to trial. What follows are the Court's findings of fact and conclusions of law that aim to put a cork in this litigation.

## PROCEDURAL HISTORY

On June 8, 2015, Plaintiff filed a Complaint. ECF No. 1 ("Compl."). On December 23, 2015, Defendants filed a Motion to Dismiss, seeking dismissal of counts two through six of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF Nos. 25-29. On September 30, 2016, this Court issued an order denying Defendants' Motion to Dismiss. ECF No. 68 ("MTD Op."). On June 7, 2017, Defendants filed a Motion for Summary Judgment. ECF Nos. 94-97. On March 26, 2018, this Court denied Defendants' Motion for Summary Judgment in its entirety. ECF No. 110 ("SJ Op.").

Following this Court's denial of Defendants' Motion for Summary Judgment, the Parties began preparing for trial. On October 24, 2018, the Court set a trial date for March 4, 2019. ECF No. 123. The Parties filed their Proposed Findings of Fact and Conclusions of Law on February 11, 2019. ECF Nos. 124, 126. The Parties submitted a Joint Final Pre-Trial Status Report and their respective exhibit lists on February 25, 2019. ECF Nos. 137-39. Trial commenced on March 4, 2019 and adjourned on March 14, 2019.

Following the trial, and pursuant to a briefing schedule approved by the Court, the Parties filed post-trial Proposed Findings of Fact and Conclusions of Law. ECF Nos. 164-67. The Parties opposed their opponent's filings on June 14, 2019. ECF Nos. 168-69. This Court issued

an order stating its ultimate findings on September 30, 2019. ECF No. 170. On August 17, 2020, the Court issued an Order to Show Cause why the Court should not reconsider its September 30, 2019 order and find Defendants liable for gross negligence in light of the fact that the Court found Defendants liable for willful misconduct. ECF No. 171. The parties filed their responses on August 31, 2020. ECF Nos. 172-73.

This Court's specific findings of fact and conclusions of law are contained herein.

## FINDINGS OF FACT[1]

I.      **The Parties**

A.      **Metrokane**

Metrokane, founded in 1982, was owned and managed by Defendant Kane, as President and CEO, Defendant Larimer, as Marketing Director, and Defendant Grossman, as COO and CFO. Jointly Stipulated Facts ¶ 1, ECF No. 120-1 ("JSF"); Kane Aff. ¶ 1, ECF No. 135 ("Kane Aff."). Defendants Kane and Larimer each owned 42.5% of Metrokane, and Defendant Grossman owned the remaining 15%. *Id*. ¶ 2. As CEO, Kane focused on the company at a macro level, dealing with product concepts and Metrokane's business relationships. Trial Tr. 604:1-11, Mar. 11, 2019; Kane Aff. ¶¶ 14, 20-21. Michael Girgenti was the Senior Vice President of Sales for all relevant periods. JSF ¶ 3; Trial Tr. 792:11-13, Mar. 13, 2019.

In the early 2000s, Metrokane launched a series of wine and barware accessories under two unique brands: Rabbit, the original wine and barware line, and Houdini, a lower-priced brand of wine and barware accessories. JSF ¶¶ 4-5. Metrokane relied primarily on those products

---

[1] The Court's findings of fact are drawn the Parties pre- and post-trial submissions, and testimony and evidence presented at trial.

to drive its growth. SJ Op. at 3. Since 2009, Metrokane's best-selling products were the Electric Rabbit Opener, the Rabbit Corkscrew, the Houdini Corkscrew, the Rabbit Wine Bottle Stopper, the Lever Corkscrew, and the Rabbit Aerator—all achieving in excess of $1 million in sales. *Id*.

Historically, Metrokane sported seasonal sales with most sales concentrated in the latter part of the year. JSF ¶ 8. In 2012, Metrokane achieved $34,667,000 in gross sales, an increase from $27,590,000 in 2011. *Id*. ¶¶ 6-7. In 2012 and 2013, Kane, along with Girgenti, led Metrokane's sales operations. *Id*. ¶ 9.

### B.  Taylor

Taylor, founded in 1851, began as a manufacturer of thermometers and barometers. JSF ¶ 10. In June 2012, Taylor was acquired by Centre Partners Management LLC ("Centre"), a middle market private equity investment firm founded in 1986. *Id*. ¶¶ 11-12. By 2013, Taylor had become a leading North American marketer of a wide range of houseware and kitchenware products and had established relationships with brand customers such as Target and Walmart. *Id*. ¶¶ 14-15. In 2018, Taylor was acquired by Lifetime Brands, Inc., but it remains a distinct corporate entity. *Id*. ¶ 18.

At all times relevant to this litigation, Robert Kay was Taylor's CEO and Executive Chairman and Terry Reilly was Taylor's Vice President of Sales and Marketing. *Id*. ¶¶ 16-17.

## II.  The Courtship

In the summer of 2012, Metrokane's investment banking firm Eureka Capital Partners, LLC ("Eureka") approached Taylor about whether it was interested in potentially acquiring Metrokane. JSF ¶ 19. Taylor was initially interested in Metrokane as a segue into the wine market—a move that would improve its position in the housewares sector. Trial Tr. 106:8-22,

Mar. 5, 2019; Trial Tr. 231:17-25, Mar. 6, 2019. Eureka sent Taylor a Confidential Information Memorandum ("CIM") in August 2012 describing Metrokane and its assets. JSF ¶ 20.

### A.    Taylor Submits Multiple Bids for Metrokane and Its Assets

Personnel from Taylor, Metrokane, Centre, and Eureka met on November 9, 2012. JSF ¶ 21. During the meeting, Grossman, Kane, and Larimer presented an overview of the Metrokane business, discussing its earnings, key customers, and projected revenue. *Id*. ¶¶ 22-23. Approximately two weeks after the meeting, Taylor submitted a Letter of Intent ("2012 LOI"). *Id*. ¶ 24. The 2012 LOI proposed an acquisition of Metrokane's assets for $72 million. *Id*. ¶ 25. The 2012 LOI was accompanied by Taylor's knowledge that Metrokane was entering new frontiers with Walmart, as Walmart was interested in buying a Metrokane product to sell during the 2012 holiday season which had not yet occurred. Trial Tr. 235:9-24, Mar. 6, 2019. Shortly thereafter, Metrokane took itself off the market to more fully evaluate the business and take more time to find the right buyer for their company. JSF ¶ 26; Grossman Aff. ¶ 26; SJ Op. at 12; Trial Tr. 483:11-485:8, Mar. 11, 2019.

In March of 2013, Metrokane distributed a second CIM ("2013 CIM") and sought new bids for the sale of its assets. JSF ¶ 27. Taylor sent an indication of interest on April 24, 2013 that included a cash purchase price of $72 million. *Id*. ¶ 28. This letter of intent did not contain an earn-out provision. *Id*. ¶ 29.

Shortly thereafter, on May 24, 2013, Metrokane gave Taylor and Centre an updated Management Presentation. JSF ¶ 30. On June 3, 2013, representatives from Metrokane, Eureka, Taylor and Centre held a meeting at the Friar's Club in New York City to further discuss the transaction. *Id*. ¶ 31. Kane, Grossman, Larimer, Girgenti, Kay, Reilly, and others from

5

Metrokane, Taylor, and Centre were in attendance. *Id*.

On June 28, 2013, Centre Lane Partners, LLC ("Centre Lane") submitted a competing bid to purchase 100% of Metrokane's outstanding stock for $70 million—an offer which contained an earn-out provision. JSF ¶ 32. Metrokane declined Centre Lane's offer. *Id*. ¶ 33.

On July 1, 2013, Taylor submitted a new LOI offering $73.5 million for Metrokane's assets, including a $1 million payment to Metrokane's owners for ongoing advisory services. JSF ¶ 34. On July 18, 2013, Taylor submitted another LOI for the purchase of Metrokane's assets for $78.75 million. *Id*. ¶ 36. The updated purchase price included a $1 million cash payment to the owners for ongoing advisory services and a $4 million "distribution payment." *Id*. The estimated closing date was September 30, 2013. *Id*. Both proposals included a net worth adjustment based on the net working capital as of the projected closing date. *Id*. ¶¶ 35, 37. The final 2013 LOI ("2013 LOI") was substantially the same, with an additional sentence indicating the Parties' agreement to work together in good faith to determine an appropriate "distribution payment" and net working capital adjustment mechanism such that both Parties would "feel indifferent" as to the timing of the sales. *Id.* ¶ 38. Kay and Kane, on behalf of their respective entities, signed the 2013 LOI, which was subject to ongoing diligence by Taylor and Centre and created no binding obligation to consummate the asset purchase. *Id*. ¶¶ 40-41.

**B.   Taylor Sees Opportunity in the Wine Accessories Industry**

The Court finds that Taylor's initial attraction to Metrokane was its success in quenching the thirst of wine consumers as a leader in the wine accessories industry. Metrokane conducted business with a variety of retailers such as Bed, Bath, & Beyond, Costco, Target, and Walmart, among others. Pl. Trial Ex. 141 at TAYLOR0017087-88, -17112. Metrokane's products ran the

6

gamut of wine accessories: corkscrews, stoppers, coolers, glasses—any product that would enhance a wine drinker's experience, Metrokane provided. *Id.* at TAYLOR0017119.

At the time of the acquisition, Taylor saw an opportunity, specifically in Metrokane's relationships with Target and Walmart. Pl. Trial Ex. 181 ¶ 21. Both these customers were slated to account for a significant percentage of Metrokane's business. JSF ¶¶ 47, 84. Metrokane knew the importance of these relationships to Taylor as it ramped up its pursuit. Trial Tr. 670:10-671:07, Mar. 11, 2019.

### 1.    Retail Awards

As a brief aside, the retailer-vendor business largely operates around periodic "awards" that retailers, like Walmart and Target, issue to various vendors, like Metrokane. JSF ¶ 43. The awards establish which products retailers will carry for any particular program period. *Id.* Additionally, and importantly in the context of this litigation, the program period awards establish which Stock Keeping Units ("SKUs") (a particular item offered for sale) the retailer will carry and the number of stores in which each SKU will be carried in the corresponding program period. *Id.* ¶ 44; Trial Tr. 609:06-09, Mar. 11, 2019; Trial Tr. 736:23-25, Mar. 12, 2019; Pl. Trial Ex. 181 ¶¶ 22-24. By and large, vendors eagerly await the release of these awards as they outline business prospects moving forward. Trial. Tr. 733:23-734:02, 736:20-22, Mar. 12, 2019; Pl. Trial Ex. 187 at 106:22-107:18. In general, the fewer stores a vendor is in, and the fewer items a vendor has on the shelf, the fewer products a vendor will sell via that particular retailer. Trial Tr. 635:16-18, Mar. 11, 2019; Trial Tr. 734:19-735:02, Mar. 12, 2019; Pl. Trial Ex. 181 ¶ 23.

At the time the Parties were negotiating the sale of Metrokane, Target and Walmart

issued program period awards in the fall which controlled the program period running from the following March through February of the next year. Pl. Trial Ex. 167 ¶¶ 4, 6; *Id.* Ex. 181 ¶ 26; *Id.* Ex. 184 ¶ 35. Program period awards are typically set in stone upon their release, and a vendor that gains or loses SKUs or stores must justify any retention or growth of sales in future years. Pl. Trial Ex. 181 ¶¶ 27-28; *Id.* Ex. 182 ¶¶ 25, 27-29; *Id.* Ex. 187 at 43:02-09, 56:24-57:24, 103:11-104:10; *Id.* Ex. 189 at 27:13-15, 133:17-134:16; *Id.* Ex. 191 at 66:23-67:14, 167:13-18, 174:17-19. In other words, there is no guarantee on a year-to-year basis what a vendor's SKU count or store count will be the following year. Pl. Trial Ex. 181 ¶ 30.

### III.   Metrokane's Relationships with Target and Walmart

As mentioned, central to this litigation are Metrokane's relationships with two of the most prominent retailers in the country—Walmart and Target. During all relevant time periods, these relationships represented a large portion of Metrokane's business and were one of the main reasons Taylor was interested in acquiring Metrokane and its assets.

#### A.   Target

In 2007, Metrokane began conducting business with Target when its Houdini products were awarded shelf space at the mega-retailer. JSF ¶ 45. By way of personnel, Robert Lovisolo was Metrokane' sales representative to Target, *id.* ¶ 46, and Jessica Baack was the Target buyer handling the Metrokane account. Trial Tr. 190:16-19, Mar. 6, 2019; Pl. Trial Ex. 182 ¶ 37. As Target's director of merchandising for kitchenware, Dean Koutroupas supervised Ms. Baack. Trial Tr. 187:01-07, Mar. 6, 2019; Pl. Trial Ex. 182 ¶ 37. Target and Metrokane maintained a fruitful and uneventful relationship from 2007 to 2013. JSF ¶¶ 45-79. In 2013, Metrokane indicated to Taylor that it anticipated Target to be its third largest customer. JSF ¶ 47.

On October 5, 2012, Target issued its 2013 Final Business VIT Award ("2013 VIT"),

announcing what Metrokane products Target would stock the following year. *Id*. ¶¶ 48, 53. The

creation of a VIT is a joint process between Target and the vendor that begins with a proposal

from the vendor as to the assortment of items the vendor would like Target to purchase and

stock. *Id*. ¶ 49. Target's 2013 VIT awarded Metrokane 15 SKUs for the upcoming program year

beginning in March 2013 and ending in February 2014. *Id*. ¶¶ 50-51, 53.

### B.     Walmart

In March 2012, David Ortiz, Walmart's then Divisional Merchandise Manager,

approached Kane at a housewares show in Chicago, thus sparking the relationship between

Metrokane and Walmart. JSF ¶ 80. In the fourth quarter of that same year, Metrokane began

selling Houdini products to Walmart for the first time. *Id*. ¶ 81. The Walmart relationship was a

big deal for Metrokane—the ability to score space with "[t]he biggest retailer in the country,

probably the world," was a massive achievement for Metrokane. Trial Tr. 525:08-25, Mar. 11,

2019; Trial Tr. 661:15-20, Mar. 11, 2019.

Metrokane anticipated that Walmart would be its largest customer for the 2013 calendar

year, given that the previous calendar year saw $2.2 million in sales to Walmart. JSF ¶¶ 83-84;

*see also* Trial Tr. 662:16-23, Mar. 11, 2019; Grossman Aff. ¶ 38, ECF No. 135-1. However, as is

customary with any new relationship in the retail industry, Metrokane and Walmart knew that

wrinkles in their relationship would need to be ironed out and that it would take time to

determine which SKUs were viable options for Walmart's shelves. *See* Trial Tr. 547:04-548:19.

### 1.     Metrokane's Point of Sale Data at Walmart

Walmart housed its point of sale ("POS") data on a proprietary online portal called Retail

Link. JSF ¶ 85. Retail Link contained a plethora of performance metrics for Metrokane's products, as well as other vendors. *Id*. ¶ 86. One of the many reports Retail Link was capable of generating was the Velocity Report, which tracked the weekly performance of Metrokane's SKUs. *Id*. ¶¶ 87-88. Retail Link was confidential and proprietary between Walmart and Metrokane. *Id*. ¶ 89. Of note, Retail Link was a new platform for Metrokane, and there was no historical data to use as a baseline because the relationship with Walmart was new. Trial Tr. 679:15-680:19, Mar. 11, 2019.

## IV.    The Evolution of Metrokane's Relationship with Target and Walmart

During the course of the drawn-out negotiations between Taylor and Defendants, the nature of Metrokane's relationship with both Target and Walmart continued to evolve.

### A.    Target

In April 2013, Target indicated, via e-mail, concern about the performance of certain Metrokane products. JSF ¶ 54. As a company jostling for the top spot in the consumer goods market, Target naturally competes with Walmart. *Id*. ¶ 55. As a result, if Walmart sells the same product offered by Target, Target will automatically match Walmart's price on that item—a maneuver that harms Target's margins. *Id*. Target calls this process "Comp Shopping" *Id*. ¶ 56. Because Metrokane had recently begun selling Houdini products at Walmart, any competing products would be Comp Shopped. *Id*. ¶¶ 57, 59. Of the fifteen (15) SKUs on Target's 2013 VIT, nine (9) were Comp Shopped. Trial Tr. 206:24-207:2, Mar. 6, 2019.

To address this issue, Metrokane proposed a solution: Houdini Deluxe. JSF ¶ 60. Houdini Deluxe products were to be sold to Target at the same price as the Houdini products, with any increase in manufacturing costs to be shouldered by Metrokane—a move that would require

major shifts in manufacturing, packaging, and sales on Metrokane's front. *Id*. ¶¶ 61-62; Trial Tr. 132:8-16, Mar. 5, 2019. Houdini Deluxe was a high-end line of wine accessories available only at Target. JSF ¶ 62. Target accepted Metrokane's Houdini Deluxe proposal but indicated that Houdini Deluxe products would have to feature material differences from the Houdini products sold at Walmart in order for those SKUs to be removed from Comp Shop. *Id*. ¶¶ 59, 62.

On June 24, 2013, Metrokane's sales representative, Lovisolo, sent Target a revised draft of the proposed 2014 VIT indicating which items would be transitioning from Houdini to Houdini Deluxe. JSF ¶ 63. On September 24, 2013, Target informed Lovisolo that it would be removed from Comp Shop and that Target would be purchasing ten (10) SKUs from Metrokane for the 2014 product year. *Id*. ¶ 67. The 2014 Final Business VIT Award ("Final 2014 VIT") was issued on September 25, 2013, awarding Metrokane ten (10) in-store SKUs (compared to fifteen (15) SKUs the prior year) including the Houdini Deluxe Silver Corkscrew, Houdini Deluxe Self Pulling Corkscrew, Houdini Deluxe Wine Bottle Stoppers, and Houdini Deluxe Aerator. *Id*. ¶¶ 69-70, 72. Nine (9) of the SKUs were also to be sold online. *Id*. ¶ 71. Metrokane's most popular products remained on the Final 2014 VIT. Grossman Aff. ¶ 83.

Metrokane received the Final 2014 VIT from Lovisolo on September 25, 2013. JSF ¶ 74. A revised Final 2014 VIT was issued by Target on October 3, 2013 and was confirmed by Girgenti on October 9, 2013. *Id*. ¶ 75. Defendants Kane and Grossman were aware of Metrokane's receipt of the Final 2014 VIT prior to the closing of the transaction with Taylor. *Id*. ¶ 76. Overall, Metrokane felt positive about Target's Final 2014 VIT despite the decrease in SKUs. Trial Tr. 612:3-10, 613:1-7, Mar. 11, 2019; Kane Aff. ¶¶ 79-82. Metrokane let Taylor know that they had received the Final 2014 VIT but did not provide the VIT to Taylor given its

11

proprietary nature. JSF ¶ 77; Kane Aff. ¶ 83.

In October 2014, Metrokane was awarded 25 SKUs for the 2015 program year. *Id.* ¶ 79.

### B.    Walmart

As previously stated, Walmart began selling Metrokane products in the fourth quarter of 2012. JSF ¶ 81. In 2013, Walmart went all in on Metrokane's barware accessory line, and took on almost 20 Metrokane SKUs. Trial Tr. at 1079:8-1080:18, Mar. 14, 2019. Metrokane disclosed to Taylor that it would be in 3,500 Walmart stores. JSF ¶ 91. Additionally, right out of the gate in 2013, Walmart awarded Metrokane an Easter promotion despite Metrokane's seasonal nature. *Id.* ¶ 92; Defs. Trial Ex. 320. Shortly after Metrokane's debut however, Walmart's Velocity Reports indicated that Metrokane's products were performing worse than expected and had both poor weekly sales and high inventory levels. JSF ¶ 88. The struggles were in large part due to the failed Easter promotion. JSF ¶¶ 93-94. Metrokane was aware of the poor sales figures. Trial Tr. 576:13-578:15, Mar. 11, 2019.

Due to poor performance, Walmart cancelled the Easter promotion resulting in Metrokane's product manufacturers building up a stock of inventory. JSF ¶¶ 95-96. Poor sales and the failed Easter promotion also influenced Walmart's decision to cancel a previously planned holiday promotion, resulting in further excess inventory of products and displays. *Id.* ¶ 95; Pl. Trial Ex. 90.

On October 29, 2013, Girgenti requested to have a conversation with the Walmart buyers to discuss the upcoming months as well as the 2014 assortment plan. JSF ¶ 97. A week or so later, Walmart e-mailed its confidential "Final Commitment" 2014 program year award ("2014 Walmart Commitment") to Kane and Girgenti. *Id.* ¶¶ 98-100. The 2014 Walmart Commitment

decreased the number of Metrokane SKUs that Walmart would carry by eight (8). *Id*. ¶ 101.

Walmart chose to cut particular SKUs for performance reasons. *Id*. ¶ 103. In addition to cutting

SKUs, the 2014 Walmart Commitment also indicated that Walmart would no longer directly

import any of Metrokane's SKUs. *Id*. ¶ 104. In other words, Walmart would buy SKUs from

Metrokane, rather than importing them directly from Metrokane's Chinese manufacturer. *Id*.

By the end of 2014, Taylor learned that Walmart had decided to cancel its wine accessory

program, thereby removing Metrokane products from Walmart stores. JSF ¶ 111. The

cancellation occurred after Taylor had purchased Metrokane and was brought about due to a

change in Walmart's divisional merchandise manager. Defs. Trial Ex. 165; Ortiz Dep. 162:6-

163:3, ECF No. 136-5; Trial Tr. 1044:8-13, Mar. 14, 2019.

## V.    Due Diligence

As a sophisticated entity, Taylor prepared to acquire Metrokane by partnering with

Centre, Paul Weiss & Rifkind LLP ("Paul Weiss"), and Alvarez & Marsal ("A&M"). JSF

¶¶ 113, 116-18. Paul Weiss conducted legal due diligence and served as legal counsel in the

negotiation of the APA, while A&M served as Taylor's financial and tax due diligence

consultant. *Id*. ¶¶ 117-18. Throughout the acquisition process, Taylor and its various advisors

conducted extensive due diligence—a process generally marked by Metrokane's cooperation and

detailed disclosures. *Id*. ¶ 113. Centre and A&M were given complete access to Metrokane's

financial data and records as well as access to a data room where information about Metrokane's

business could be retrieved. *Id*. ¶¶ 124-26; Pl. Trial Ex. 183 ¶ 37; Grossman Aff. ¶ 67.

Representatives from Taylor and Metrokane were in constant communication leading up to the

acquisition, during negotiations, and after the deal was consummated. JSF ¶¶ 113-158.

13

Broadly speaking, Taylor received multiple rounds of financial projections, data and disclosures pertaining to pipeline fill and excess inventory, stocking volume numbers, and projected revenues. JSF ¶¶ 126, 131-32, 135, 138. Taylor became familiar with Metrokane's products: which SKUs were big sellers, and which flopped. Trial Tr. 244:25-245:7, Mar. 6, 2019. Kay and Kane conversed weekly. Trial Tr. 243:22-244:12, Mar. 6, 2019; JSF ¶ 115. By and large, Metrokane provided Taylor with access to every piece of data or information requested. Trial Tr. 136:16-20, Mar. 5, 2019. Taylor closely tracked risks discovered during due diligence, continually requesting follow-up diligence and updated projections. Defs. Trial Ex. 169. During due diligence, Metrokane provided Plaintiff with information that indicated that no single customer represented more than 20% of Metrokane's total sales. JSF ¶ 123.

A.      2012 Due Diligence and Disclosures

Taylor and Metrokane, via various personnel and representatives, exchanged memoranda and data, held meetings, conducted conference calls, including with Metrokane's customers, made and attended presentations and engaged in dialogue.

In August 2012, Eureka sent Taylor a Confidential Information Memorandum ("2012 CIM") describing Metrokane and its business. JSF ¶ 20. The 2012 CIM was reviewed by Kane and Grossman, both of whom knew the importance of these early disclosures and the need for an accurate portrayal of Metrokane and its assets. Trial Tr. 481:16-482:10, 495:3-14, Mar. 11, 2019. The 2012 CIM included statements indicating the strength and positive nature of Metrokane's relationship with Target and Walmart. Pl. Trial Ex. 181 ¶ 8.

In November 2012, representatives from Taylor and Centre met with representatives from Metrokane and investment bankers from Eureka—a meeting which included a management

14

presentation from Metrokane. JSF ¶¶ 21-22. Of the four major retail customers discussed in the presentation, Target and Walmart were two, while Costco, another primary Metrokane customer, was not included. Pl. Trial Ex. 2. Once again, the Metrokane representatives discussed the health and positive nature of its relationship with Target and Walmart. Pl. Trial Ex. 181 ¶¶ 11-14.

### B.   2013 Due Diligence and Disclosures

After taking itself off the market, Metrokane distributed a second CIM ("2013 CIM") and solicited new bids for the sale of its assets. JSF ¶ 27. The 2013 CIM described the strength of Metrokane's relationship with Target and Walmart, and specifically outlined the significant sales growth that would result from Metrokane's relationship with Walmart. Pl. Trial Ex. 181 ¶ 20; Pl. Trial Ex. 4 at TAYLOR0000203, -223, -225, -226. The information included in the 2013 CIM reflected Metrokane's assessment of its current and projected value and was aimed at giving prospective buyers a picture of the present and future of the Metrokane business. Trial Tr. 494:07-495:02, Mar. 11, 2019.

In April 2013, representatives from Taylor, Centre, and Metrokane discussed Metrokane's relationship with Target and Walmart. Pl. Trial Ex. 8; *Id.* Ex. 181 ¶ 34. Regarding Walmart, the Parties discussed the SKU and store count specifically. Pl. Trial Ex. 8; *Id.* Ex. 181 ¶ 36. Regarding Target, the Parties discussed Target's reaction to Metrokane's partnership with Walmart, as well as overall SKU count. *Id.* More specifically, Metrokane told Taylor that Target had no problem with Metrokane selling the same products to Walmart. Pl. Trial Ex. 8. Metrokane indicated that the relationship with Walmart was strong, and further growth was anticipated moving forward. Pl. Trial Ex. 8; *Id.* Ex. 181 ¶ 38; *Id.* Ex. 183 ¶ 26.

In May 2013, Metrokane gave Taylor, and others, an updated management presentation

focused on a few of its primary customers—namely Target, Walmart, Bed, Bath & Beyond, and Macy's. JSF ¶ 30; Pl. Trial Ex. 19. SKU count for each customer was provided as an indicator of the health and scope of the existing relationship between Metrokane and each of the retailers. Pl. Trial Ex. 19. As with the 2013 CIM, the management presentation touted the positive nature of Metrokane's relationship with its retailers—Target and Walmart in particular. *Id.* at TAYLOR0032718, -32721; Pl. Trial Ex. 181 ¶ 46. The management presentation contained details on Houdini Deluxe and projected further growth for Walmart and Target. *Id.*

On June 3, 2013, the Parties met at the Friar's Club in New York. JSF ¶ 31. Metrokane reinforced Target's and Walmart's status as top customers and continued to discuss their concerns regarding the impact of Metrokane's sales at Walmart on their relationship with Target. Trial Tr. 343:24-344:2, Mar. 7, 2019; Pl. Trial Ex. 181 ¶ 45; JSF ¶ 127. Metrokane explained their solution to this issue, Houdini Deluxe, in depth. Trial Tr. 667:2-668:14, Mar. 11, 2019. While the Comp Shop issues had not been solved by the time of the Friar's Club meeting, Metrokane was committed to making the necessary changes to placate Target's concerns, and their plans and intentions were communicated to Taylor. JSF ¶ 128. Following the meeting at the Friar's Club, Taylor requested additional due diligence, which Metrokane provided. *Id.* ¶¶ 129-30.

Metrokane's positive outlook on the state of its business continued through June and July of 2013. Pl. Trial Exs. 29, 52. In a pair of conference calls, Metrokane officials continued to trumpet the strength of Metrokane's relationship with Target and Walmart. Pl. Trial Ex. 30, *Id.* Ex 52 at TAYLOR0000322; Trial Tr. 356:19-358:18, Mar. 7, 2019; Pl. Trial Ex. 183 ¶ 36. Aside from presentations by and meetings directly with Metrokane and its personnel, Taylor,

Centre, and A&M also requested additional due diligence in part due to concerns regarding Metrokane's relationship with Target and Walmart. JSF ¶¶ 129-30, 133. By July of 2013, Taylor had become aware of the risk that Walmart's initial pipeline fill of inventory could be non-recurring. *Id.* ¶ 131. Plaintiff, with the help of Centre and A&M, sought more information regarding this issue. *Id.* ¶ 132.

In August, on-site financial due diligence meetings were conducted with Metrokane, Taylor, Centre, and A&M. Pl. Trial Ex. 68. Metrokane disclosed several facts that further suggested that "a significant piece of Walmart business is either one-time pipeline fill or non-recurring in nature." Pl. Trial Ex. 81. The Parties also discussed the transition to Houdini Deluxe at Target. JSF ¶ 137; Pl. Trial Ex. 91 at ALVAREZ0003688. At the same meetings, Defendants disclosed that seven (7) of the fifteen (15) SKUs that Metrokane sold to Target were undergoing a material change as part of the transition to Houdini Deluxe. JSF ¶ 140. On August 30, 2013, Taylor, Centre and A&M were provided with revised 2013 projections estimating total 2013 sales of $37,031,132. *Id.* ¶ 141. This projection indicated a decrease in Walmart's projected 2013 sales by $511,371. *Id.* ¶ 142.

The Parties continued to participate in conference calls throughout September and October of 2013. Pl. Trial Ex. 97. Taylor was consistently wary of Metrokane's projections and disclosures, a concern highlighted by constant requests for additional clarifying data. Defs. Trial Ex. 173. In October 2013, Metrokane projected approximately $35 to $37 million in sales for the upcoming year. Pl. Trial Exs. 112, 114. By then, Taylor had a fairly clear picture of the nature of Metrokane's relationship with Target and Walmart, specifically how relatively new and somewhat uncertain the relationship with Walmart was, as well as the proposed solution

(Houdini Deluxe) to keep Target happy while Metrokane continued to sell their products to one of Target's largest competitors. As negotiations continued, Metrokane continued to send financial projections to Taylor's team. Defs. Trial Ex. 50; Pl. Trial Ex. 94.

In October 2013, representatives from Taylor and Metrokane had calls with representatives from Target and Walmart. JSF ¶¶ 144-49. Kay spoke with Ortiz (from Walmart), keeping the conversation high level and refraining from touching on the details of Metrokane's sales due to the confidential nature of those figures. *Id*. ¶¶ 144-45. Reilly spoke with Baack (from Target) and likewise had a high-level conversation that did not delve into the details of Metrokane's sales. *Id*. ¶¶ 146-49.

On October 26, 2013, Grossman sent Girgenti a proposed draft disclosure letter containing information on Metrokane's fifteen (15) largest customers. JSF ¶ 171. The draft disclosure indicated that there were "no materially adverse" known or expected changes with regards to Target and Walmart. *Id*. ¶ 172. In corresponding with Grossman, Girgenti flagged no missing information or inaccuracies in the draft disclosure and indicated that the Target and Walmart business would be "up or even for the year." *Id*. ¶ 173. Grossman then sent the draft disclosure to Eureka and Metrokane's counsel, as well as to Taylor's counsel. *Id*. ¶¶ 174-76. The disclosure letter did not contain any indication of material changes to Metrokane's relationship with Walmart or Target, and did not mention changes in SKU count or any other sales performance metrics. *Id*. ¶ 191. It did, however, indicate material changes for eight (8) out of the fifteen (15) customers listed. *Id*. ¶ 192.

As closing approached, A&M, Centre and Taylor continued their due diligence efforts. JSF ¶ 151. For the most part, Metrokane continued to provide all interested parties with the

requested information. *Id.* ¶153. However, at no point did Metrokane disclose data pertaining to the 2014 program year awards from Target or Walmart. Pl. Trial Ex. 181 ¶¶ 94-98; *Id.* Ex. 184 ¶ 39, 41-46.

## VI.    Metrokane's Representations and Omissions During the Diligence Process

As indicated by the testimony provided, the Court finds that there were certain pieces of information that Metrokane did not disclose. Pl. Trial Ex. 141; JSF ¶¶ 70, 101. Despite Taylor's constant questions pertaining to the state of the Target and Walmart relationships, questions indicating the importance of those relationships to Taylor throughout the acquisition process, Metrokane and its officials did not provide a complete picture of these relationships. For example, while Metrokane disclosed their Houdini Deluxe plans, Metrokane did not disclose the full extent of the issues Target and Metrokane were attempting to sort out. Specifically, Metrokane did not disclose that certain SKUs had been dropped from Target's 2014 VIT because they had yet to satisfy Target's Comp shop requirements. Pl. Trial Ex. 181 ¶¶ 95-98. Taylor did, however, know that Metrokane was rolling out an entirely new line of products at Target. *Id*. ¶¶ 153, 167. Metrokane also did not disclose the significant drop in SKU count or store count set forth in the program award for 2014 ("2014 Walmart Commitment"). Pl. Trial Ex. 141. While Taylor knew about the vastly unsuccessful Easter promotion and general troubles Metrokane was having at Walmart with sales and inventory, Taylor did not know how those issues played out in the 2014 Walmart Commitment. Trial Tr. 251:24-252:06, Mar. 6, 2019; Pl. Trial Ex. 81.

It is undisputed that Metrokane was not allowed to share copies of the vendor awards or Retail Link information due to confidentiality obligations Metrokane owed to Target and Walmart. JSF ¶ 114. Both Metrokane and Taylor were aware of these restrictions. *Id*. Further, the

confidentiality restrictions flowed both ways as Target and Walmart also did not share specific details with Taylor about Metrokane's sales. *Id.* ¶¶ 145, 149.

**VII.    The Closing and Asset Purchase Agreement ("APA")**

As previously established, the 2013 LOI was signed in July 2013 by Kay and Kane on behalf of their respective entities. JSF ¶ 40. The 2013 LOI was subject to ongoing diligence by Taylor and Centre and created no binding obligation to consummate the asset purchase. *Id.* ¶ 41. In August of 2013, Metrokane provided Taylor with its June 2013 financial results which showed numbers that were lower than previously projected, causing Taylor to wait until additional financial data became available before moving forward with the agreed upon purchase price. Pl. Trial Exs. 62, 64, 66. On August 30, 2013, Eureka sent Centre, Taylor, and A&M revised 2013 projections and sales estimates projecting $37,031,132 million in sales in 2013. JSF ¶ 141. The updated projections were down from the original projections and indicated a decrease in Walmart's projected sales of about $500,000. *Id.* ¶ 142.

The Asset Purchase Agreement ("APA") governed the sale of Metrokane to Taylor. The first draft was circulated by Taylor's counsel on August 21, 2013. JSF ¶ 159. In September of 2013, upon reviewing Metrokane's financials, Taylor and Centre discussed incorporating an "earn out" provision into the APA and ultimately circulated a revised deal structure. *Id.* ¶¶ 160-61. Taylor's counsel circulated another revised APA on October 15, 2013. *Id.* ¶ 163. Metrokane did not agree to an "earn out" provision. *Id.* ¶ 165. In addition to discussions about "earn out" provisions, Taylor also sought to remove language in the APA pertaining to the materiality of disclosures. JSF ¶¶ 167-68. Metrokane also rejected that request. *Id.* ¶ 170.

In or about October and early November 2013, Grossman offered to re-structure the deal

so that Metrokane would assume additional risk due to some negative information Taylor had received pertaining to Metrokane's business. JSF ¶ 178. That offer manifested itself in a $4-5 million reduction in the cash component of the purchase. *Id*. ¶ 179.

The Parties signed the APA on November 12, 2013. JSF ¶ 181; Pl. Trial Ex. 148. At closing, Defendants received $70.7 million in cash from Plaintiff. JSF ¶ 198. Kane, Larimer, and Grossman stood to gain the most from the sale, with Kane and Larimer receiving $47,492,162 and Grossman receiving $9,052,339. JSF ¶¶ 201-03.

To finance the sale, Centre and Taylor used debt financing. JSF ¶ 204. In preparing to acquire Metrokane, Taylor shared information with its lenders, including the anticipated and eventually accepted offer. *Id*. ¶ 206.

## VIII.   Valuation and EBITDA Calculations

As discussed *infra*, the testimony and arguments relating to the valuation of Metrokane and its assets was unclear. However, Taylor itself relied on their own adjusted and projected growth rates—numbers calculated using Metrokane's trailing twelve month ("TTM") adjusted EBITDA[2] and a purchase price multiple. Pl. Trial Ex. 181 ¶¶ 16, 68-69, 71, 102, 106-127. The TTM adjusted EBITDA figures Taylor used fluctuated over time. *See, e.g.*, *id*. ¶ 110. Taylor and Centre constantly calculated the adjusted EBITDA and identified an implied purchase price multiple in an effort to predict Metrokane's future value and cash flow. Pl. Trial Ex. 152. Admittedly, Taylor's EBITDA and deal model calculations were for Taylor's internal use and for their lenders. Pl. Trial Ex. 183 ¶ 86.

---

[2] "EBITDA is 'earnings before interest, taxes, depreciation, and amortization,' and is 'used as an indicator of a company's profitability and ability to service its debt.'" *In re Lehman Bros. Holdings Inc.*, 544 B.R. 62, 68 n.9 (Bankr. S.D.N.Y. 2015) (quoting Black's Law Dictionary (10th ed. 2014)).

IX.    **Post-Closing**

Prior to a November 20, 2013 meeting with Walmart, Plaintiff learned that Metrokane's business with Walmart was not necessarily as Defendants had represented. JSF ¶ 209. Two months later, on January 16, 2014, Reilly e-mailed Jessica Baack from Target and indicated surprise that the number of SKUs on Target's 2014 VIT award had decreased. *Id*. ¶ 210. Taylor learned for the first time, post-closing, that both Target and Walmart were cutting their SKU count significantly. Pl. Trial Ex. 181 ¶ 150. Taylor learned this information directly from Target and via internal documents accessible after the transition. *Id.* ¶ 149.

After closing, Taylor owned the rights to the Metrokane brand name, and Metrokane changed its name to The Larimer Group, Inc., which remains an active New York business corporation. JSF ¶ 200.

A.    **2015 Relationships with Target and Walmart**

Walmart ended up cancelling its wine accessory program by the end of 2014. JSF ¶ 111. Thus, Walmart went from being one of Metrokane's most promising relationships, to a non-existent relationship about a year after the closing. At Target, on the other hand, Metrokane products continued to flourish after the transition to Houdini Deluxe had been completed. Pl. Trial Ex. 181 ¶¶ 160-62. Target increased Metrokane's SKU count, and ultimately Metrokane sales at Target also increased. *Id*.

X.    **The Instant Law Suit**

The Court presided over a bench trial in this case from March 4 to March 14, 2019. The Court heard testimony and reviewed extensive amounts of physical evidence. The Court has also considered the post-trial submissions from the Parties. ECF Nos. 164, 167-69, 172-73. Having

determined the facts, the Court now makes its conclusions of law.

## CONCLUSIONS OF LAW

This Court finds Defendant Metrokane liable for breach of contract, and Defendants Metrokane, Grossman, and Kane liable for willful misconduct and gross negligence. This court does not find sufficient evidence to support Plaintiff's fraud claim. While Plaintiff satisfied its burden of proof with regard to the existence of damages, the Court will require further briefing to better determine the extent of those damages.

## I.    Choice of Law

The Parties do not dispute that New York law applies to this case, as the APA signed by the Parties on November 12, 2013 "provides that New York law applies to claims arising out [of] it." SJ Op. at 31, n.10.

## II.    Breach of Contract

A plaintiff asserting a claim for breach of contract under New York law must satisfy the following elements: "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (internal citation and quotation marks omitted).

### A.    Formation of a Contract and Performance by Plaintiff

It is undisputed that the first and second elements of a breach of contract claim have been satisfied. The Parties entered into a binding contract—the APA—on November 12, 2013. JSF ¶¶ 181-82. Plaintiff performed by tendering the agreed upon price. JSF ¶¶ 197-98.

### B.    Defendants' Failure to Perform

Regarding the third element, whether Metrokane failed to perform under the APA, the

Court turns to the language of the APA itself.[3] *See, e.g., Vetromile v. JPI Partners, LLC*, 706 F. Supp. 2d 442, 447 (S.D.N.Y. 2010) (noting that New York law requires, as part of the Court's role as initial arbiter of the legal import of a contract, "to give effect to the intention of the parties as expressed in the unequivocal language they have employed" without "admit[ting] extrinsic evidence" (internal citations and quotation marks omitted)). Section 5.24 of the APA states that the disclosure letter accompanying the APA outlines the state of business for Metrokane's fifteen (15) largest customers and ten (10) largest suppliers. Pl. Trial Ex. 148 at EUREKA0061181. It goes on to state that none of the entities disclosed:

> (i) [have] threatened to cancel or otherwise terminate or, to the Knowledge of Seller, intends to cancel or otherwise terminate, the relationship of such Person with Seller or (b) [sic] [have] materially modified or decreased materially or threatened to materially modify or decrease materially or limit materially or, to the Knowledge of Seller, intends to materially modify its relationship with Seller or intends to decrease materially its purchases from, or services or supplies to, Seller.[4]

*Id.* Plaintiff argues that Defendants breached section 5.24 by failing to disclose "modifications (material or otherwise), decreases or limitations, actual, threatened or intended, to Metrokane's relationships with Target and Walmart." Pl. Br. at 96, ECF No. 167. The Court agrees.

The evidence presented at trial demonstrates that Metrokane did not disclose the material changes in Metrokane's relationships with Target and Walmart in the disclosure letter accompanying the APA. Specifically, Defendants failed to disclose the decrease in SKU and

---

[3] As a preliminary matter, this Court previously concluded that Plaintiff need not demonstrate that Seller Defendants' failure to disclose modifications to certain customer relationships was material. SJ Op. at 34-35. Materiality is only a relevant consideration when ascertaining the quantum of damages to be awarded. *See Orlander*, 802 F.3d at 298.

[4] Section 9.2 of the APA contains Metrokane's agreement to indemnify Taylor "from and against . . . any and all Losses . . . resulting from . . . the breach of any of the Seller Representations." Pl. Trial Ex. 148 at EUREKA0061195.

store count at Walmart and the decrease in SKU count at Target. JSF ¶¶ 69-77, 98-104; *see also* Pl. Trial Ex. 141 at TAYLOR0017112-13. Metrokane was aware of these material changes, as they were laid out in Target and Walmart's respective program year awards. JSF ¶¶ 69, 74-76, 98-100.

Metrokane's omissions are amplified by its choice of disclosures. Pl. Trial Ex. 141. Among other things, Metrokane disclosed missed revenue projections for Total Wine & More and Crate & Barrel. *Id*. at TAYLOR0017112. Metrokane disclosed lost sales at Stein Mart. *Id*. at TAYLOR0017112-13. Metrokane named specific SKUs discontinued at Costco, Total Wine & More, and Crate & Barrel. *Id*.

It is true, as Defendants argue, that the APA does not explicitly require the disclosure of SKU counts. Defs. Br. at 60, ECF No. 164. It is also true that SKU count is not the only indicator of the strength or weakness of a relationship between a retailer and a vendor (and this Court need not resolve the disagreement between the parties as to precisely how important SKU count is in determining the health and growth potential of a business relationship). The fact of the matter is, Metrokane had touted SKU count at Target and Walmart throughout the negotiation process. *See, e.g.*, Pl. Trial Ex. 19 at TAYLOR0032718, -32721. In the disclosure letter accompanying the APA, however, they were completely silent on SKU count at Target and Walmart, all the while knowing that the 2014 Walmart Commitment decreased Metrokane's SKUs by eight (8), and that Target's 2014 VIT decreased the SKUs by five (5). JSF ¶¶ 70, 101; Pl. Trial Ex. 141. Thus, Metrokane failed to disclose "material[] modifi[cations]" to its relationships with Target and Walmart. Pl. Trial Ex. 141.

The Court acknowledges the confidential nature of the VIT and program year awards and

by no means suggests that Metrokane was required to produce confidential documents. However, under Section 5.24, Metrokane was obligated to disclose these changes in some way, shape or form. The ultimate effects of the changes in SKU count are irrelevant to the fact that there was a change and that Metrokane needed to disclose this information. Even if the Court were to agree with Defendants' assessment of the ultimate impact of this information, Metrokane was not in a position to make the ultimate determination as to the meaning of a reduction in SKU count on behalf of both Parties. Defendants were not entitled to hold on to that information, sit back, and wait for Taylor to ask. Rather, Metrokane had an affirmative obligation to disclose the material changes in its relationships with Target and Walmart, specifically those changes indicated in the 2014 program awards. Because they failed to do so, Plaintiff has satisfied the third element of its breach of contract claim.

### C.   Damages

The breach of contract inquiry, however, does not end there. The fourth and final element Plaintiff must prove is damages.

As stated in this Court's Summary Judgment Opinion, in the context of a New York breach of contract claim, "[a] party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007) (citation omitted); SJ Op. at 68. A plaintiff is "entitled to the benefit of its bargain, measured as the difference between the value of [the company it purchased] as warranted by [Seller] and its true value at the time of the transaction." *Id*. (citations omitted). Because "contract damages are measured at the time of the breach," inquiry into the performance of Metrokane's assets and "market conditions

in the months following the acquisition" is improper, as events subsequent to the breach "may neither offset nor enhance [Buyer's] general damages." *Id*. (citation omitted). Moreover, "[s]uch damages are general rather than consequential and therefore the plaintiff is required to show with reasonable certainty the fact of damage, not its amount." *Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 220 (S.D.N.Y. 2010) (internal citation and quotation marks omitted).

The Court finds that Plaintiff has proven the fact of damage. *See Koch Indus.*, 727 F. Supp. 2d at 220. However, as discussed below, Plaintiff has failed to provide a "reasonable estimate" of damages, particularly in light of the Court's ultimate findings. *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007). Specifically, Taylor has not demonstrated "the position it would have occupied had the contract been fulfilled according to its terms." *Merrill Lynch*, 500 F.3d at 185. "New York Courts have significant flexibility in estimating general damages once the fact of liability is established." *Tractebel Energy*, 487 F.3d at 112. Plaintiff has proved that Defendants' failure to disclose material changes in their relationships with Walmart and Target caused it to pay an inflated price for Metrokane because the state of these relationships was not what it seemed. However, a question still remains as to how inflated that price was.

Thus, the Court finds Defendants liable for breach of contract.

## III.   Common Law Fraud[5]

Under New York Law, "a plaintiff alleging fraud must show by clear and convincing evidence that the defendant knowingly or recklessly misrepresented a material fact, intending to

---

[5] The Court previously determined that Plaintiff's common-law fraud, gross negligence, and willful misconduct claims are not duplicative. SJ Op. at 37-40.

induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered

damage as a result." *Merrill Lynch*, 500 F.3d at 181 (citations omitted).

### A.      Misrepresentation

It is clear from the record that Defendants made numerous statements that walked a fine

line between truth and falsity. Additionally, as discussed in the previous section, Metrokane

omitted information from the disclosure letter accompanying the APA pertaining to SKU and

store count at Target and Walmart. On the other hand, many of the statements Plaintiff relies on

to support its fraud claim do not necessarily carry a truth value—they are simply a matter of

opinion or perspective. The Court finds that Metrokane made specific misrepresentations and

omitted information regarding SKU and store count sufficient to support a finding of fraud, but

that more general statements of opinion are insufficient to carry Plaintiff's fraud claim.

In terms of specific misrepresentations, in the management presentation associated with

the 2013 CIM, Metrokane indicated that "Walmart . . . will carry 28 different Houdini SKUs."

Pl. Trial Ex. 19 at TAYLOR0032718. That was not true. Metrokane had a total of 19 active

Houdini SKUs for the 2013 program year. Pl. Trial Ex. 22. Additionally, in the same

presentation, Metrokane stated that Houdini Deluxe would "initially consist of approximately 25

items." Pl. Trial Ex. 19 at TAYLOR0032721. That was also false. There was no indication that

Target would carry that many Houdini Deluxe SKUs. Moreover, when Metrokane first

encountered Target's Comp Shop policy, Metrokane told Taylor that Target had no problem with

Metrokane selling the same products to Walmart, which was also untrue. Pl. Trial Ex. 8; Trial Tr.

665:04-667:01, Mar. 11, 2019.

In terms of omissions, Defendants failed to disclose the fact that both Target and

Walmart had significantly cut the number of Metrokane SKUs they would carry for the upcoming award year. JSF ¶¶ 70, 101. The 2014 Walmart Commitment decreased the number of Metrokane SKUs by eight (8), and Target's Final 2014 VIT decreased the Metrokane SKU count by five (5). *Id*. The Court finds that these misrepresentations and omissions are sufficient to satisfy the corresponding element on Taylor's fraud claim.

The Court does not find the other alleged misrepresentations and omissions sufficient to make out a fraud claim. For example, Taylor contests Metrokane's assessment of its point of sale data at Walmart as "solid," with "some winners and some losers." Pl. Br. at 102, ECF No. 167. Further, Taylor argues that Metrokane's report that the relationship with Target was "good" was a misrepresentation. *Id*. These contentions are simply with the choice and interpretation of descriptive words, not with misrepresentations carrying a true or false value. From Metrokane's perspective, things were "good" at Target and Walmart. Target was allowing Metrokane to roll out an exclusive line. Walmart, the biggest retailer in the world, was excited to continue to do business with Metrokane in the future. While Metrokane was not fully forthcoming, particularly in the disclosure letter accompanying the APA, Taylor's gripes with the language used to describe Metrokane's relationships with Target and Walmart are insufficient to satisfy the misrepresentation element. *See Transnational Mgmt. Sys. II, LLC v. Carcione*, No. 14-cv-2151, 2016 WL 7077040, *6 (S.D.N.Y. Dec. 5, 2016) (description of offer price as "bottom of the market" was statement of opinion that was not actionable as fraud), *appeal withdrawn*, 2017 WL 6759302 (2d Cir. Feb. 23, 2017); *Moore v. Thomson Reuters (GRC) Inc.*, No. 17-cv-2111, 2017 WL 4083582, *6 (S.D.N.Y. Sept. 14, 2017) (alleged misrepresentations that relocation would be a "great opportunity" and in plaintiff's "best interest" are non-actionable statements of subjective

opinion). Moreover, Taylor's continuous reliance on Kane's testimony that there was a "crisis" when Target found out Metrokane was selling the same products to Walmart as proof that Metrokane's relationship with Target was in "crisis" throughout the negotiations is misplaced. Pl. Br. at 39, 102, ECF No. 167; Trial Tr. 536:07-17, Mar. 11, 2019. Metrokane, as indicated by the record, addressed that "crisis" in a way that was satisfactory to Target, and disclosed their solution (the Houdini Deluxe rollout) to Taylor.

In sum, this Court finds that Metrokane made misrepresentations and omitted information, specifically pertaining to SKU and store count in the disclosure letter accompanying the APA, sufficient to satisfy the misrepresentation prong of Plaintiff's fraud claim.

### B.    Materiality

Under New York law, a misrepresentation is material if it is "sufficiently important or relevant to influence the plaintiff's decision." *Aguirre v. Best Care Agency, Inc*., 961 F. Supp. 2d 427, 448 (E.D.N.Y. 2013) (citation omitted). "A fact may not be dismissed as immaterial unless it is so obviously unimportant . . . that reasonable minds could not differ on the question of [its] importance." *Allen v. WestPoint-Pepperell, Inc*., 945 F.2d 40, 45 (2d Cir. 1991) (internal citations and quotation marks omitted).

Here, the misrepresentations pertaining to the 2014 program year awards and SKU and store counts were material. As discussed *supra*, Defendants were contractually obligated to disclose material changes to Metrokane's relationships with Target and Walmart. Pl. Trial Ex. 148 at EUREKA0061181. Target and Walmart were two of Metrokane's top customers. JSF ¶¶ 47, 84. Throughout negotiations, Metrokane touted the number of SKUs carried by Target, Walmart, and many of its other vendors, as indicators of the strength of those relationships. Pl.

Trial Ex. 19 at TAYLOR0032718, -32721. Metrokane knew that SKU count was a factor in determining the health of a retailer-vendor relationship because they used that metric to prove that very thing—a fact highlighted by the disclosure letter accompanying the APA. JSF ¶ 192; Pl. Trial Ex. 141 at TAYLOR0017112-13.

Therefore, this Court finds that the misrepresentations and ommissions regarding Metrokane's relationships with Target and Walmart were, in fact, material.

### C.    Scienter

To prove scienter, a plaintiff must demonstrate an "intentional or reckless misstatement made with the intent that plaintiff rely upon it." *Brown v. Stinson*, 821 F. Supp. 910, 914 (S.D.N.Y. 1993) (citation omitted). To show an intentional misstatement, the "plaintiff[] must establish that defendant[s] knew, at the time the[] [statements] were made, that the representations were false." *E\*TRADE Fin. Corp. v. Deutsche Bank AG*, 631 F. Supp. 2d 313, 387 (S.D.N.Y. 2009) (citation omitted), *aff'd*, 374 F. App'x 119 (2d Cir. 2010). This may be achieved through circumstantial evidence that "support[s] a strong inference that the defendants possessed the requisite fraudulent intent." *Trainum v. Rockwell Collins, Inc.*, No. 16-cv-7005, 2017 WL 2377988, at *13 (S.D.N.Y. May 31, 2017) (quoting *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 222-23 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009)) (internal quotation marks omitted), *aff'd*, 765 F. App'x 514 (2d Cir. 2019). This "strong inference" can be shown "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994), *superseded by statute as stated in In re Paracelsus*

31

*Corp. Sec. Litig.*, 61 F. Supp. 2d 591, 595 (S.D. Tex. 1998)).

Here, the Court finds that Defendants knew that their representations and omissions were false or misleading. Focusing on the 2014 program awards, it is undisputed that Target and Walmart delivered their respective awards to Metrokane prior to closing. JSF ¶¶ 69, 98. At the absolute minimum, Defendants knew of the awards, knew that the SKU counts for both Target and Walmart had been slashed, and knew the store count for Walmart had also been cut. Pl. Trial Exs. 107, 138, 139. Rather than present Plaintiff with the updated information in a manner consistent with their confidentiality agreements with Target and Walmart, Metrokane omitted the information entirely from the disclosure letter accompanying the APA. Moreover, Metrokane failed to disclose this material information in continued discussions with Taylor personnel. Instead, Metrokane continued to tout the strength of their relationship with Target and Walmart without giving Taylor a chance to consider the updated SKU and store counts. The disclosure letter was part of the APA, and Defendants knew that Plaintiff would rely on the representations in the disclosure letter in finalizing the deal. Pl. Trial Ex. 141. These actions paired with Metrokane's knowledge is sufficient to prove an "intentional or reckless misstatement made with the intent that plaintiff rely upon it." *Brown*, 821 F. Supp. at 914.

### D.    Reasonable Reliance

To succeed on a fraudulent misrepresentation claim, a plaintiff must demonstrate that it reasonably relied upon the misrepresentation. "In assessing whether reliance on [an] allegedly fraudulent misrepresentation[] is reasonable or justifiable, New York takes a contextual view." *See Trainum*, 2017 WL 2377988, at *14 (internal citation and quotation marks omitted). "Specifically, courts consider whether the [plaintiff] received any clear and direct signs of

falsity, whether the [plaintiff] had access to relevant information, whether the [plaintiff] received a written (purported) confirmation of the truthfulness of the representations at issue, and whether the [plaintiff] is sophisticated." *Id*. (internal citation and quotation marks omitted). More concisely stated, "[r]easonable reliance entails a duty to investigate the legitimacy of an investment opportunity where plaintiff was placed on guard or practically faced with the facts." *Crigger v. Fahnestock & Co*., 443 F.3d 230, 234 (2d Cir. 2006) (internal citation and quotation marks omitted).

A general duty to exercise minimal diligence is heightened in the context of negotiations between sophisticated business entities. *See Tranium*, 2017 WL 2377988, at *14. "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir.) (internal citation and quotation marks omitted), *cert. denied*, 522 U.S. 864 (1997). However, "[w]hen matters are held to be peculiarly within defendant's knowledge[] . . . [it is] said that plaintiff may rely without prosecuting an investigation, as he ha[d] no independent means of ascertaining the truth." *Crigger*, 443 F.3d at 234; *see also Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir. 1998) ("[T]he peculiar-knowledge exception is designed to address circumstances where a party would face high costs in determining the truth or falsity of an oral representation, and those costs are sufficiently great to render reliance upon the representation reasonable." (internal citations omitted)). Even so, "[a] plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to

ferret out the reliability or truth about an investment." *Crigger*, 443 F.3d at 234.

The Court is unpersuaded that Taylor reasonably relied on the misrepresentations made by Metrokane, Kane, and Grossman. As discussed, the misrepresentations carrying Plaintiff's fraud claim predominately stem from Metrokane's failure to disclose the 2014 program awards from Target and Walmart, misrepresentations and omissions pertaining to SKU and store count, and insufficient disclosures in the disclosure letter accompanying the APA. However, Taylor was not reasonable to rely on those limited misrepresentations without seeking further assurance.

It is undisputed that the diligence and negotiation period leading up to this deal was lengthy, involved massive amounts of information and data, and featured multiple rounds of presentations, customer calls, and data swaps. JSF ¶¶ 113-158. Via those disclosures and negotiations, Taylor knew more than enough to assess the nature of Metrokane's relationships with Target and Walmart, and, if it had any doubts about proceeding with the deal, it was aware of sufficient red flags to warrant requesting additional information or assurances. *See Lazard Freres*, 108 F.3d at 1541-43. Taylor had access to immense amounts of data via its data room, had access to historical sales numbers, projections, and financials, and knew which items were big sellers and which items flopped. JSF ¶¶ 113-124; Pl. Trial Exs. 63, 94; Trial Tr. 244:25-245:7, Mar. 6, 2019. Taylor knew that Metrokane's relationship with Walmart was new, and, as a sophisticated business entity with experience dealing with big box stores, it knew that new partnerships take time to iron out—that the first go around very rarely exists within final operating parameters. JSF ¶ 121; *see also* Trial Tr. 547:04-548:19. Taylor knew that Walmart's Easter promotion did not go well, and that there were sell through and inventory issues. Trial Tr. 251:24-252:06, Mar. 6, 2018; JSF ¶¶ 129-133. Taylor knew that Metrokane was a seasonal

product, with the vast majority of its sales coming in a very short period of time. Taylor knew about the Comp Shop issues, specifically that Metrokane was rolling out an entirely new line of products specifically for Target that would need to be distinguishable from those sold at Walmart. Trial Tr. 268:12-270:9, Mar. 6, 2019. None of this information was confidential.

In sum, Taylor had access to sufficient information to know that the relationships with Walmart and Target were perhaps not what the numbers indicated. One company had failed promotions and excess inventory, and another was going through a launch of an entirely new product. And those two companies were, according to Plaintiff, of primary interest to Taylor. While this Court does not suggest that Taylor should have asked for the actual confidential final awards, Taylor should have asked for further diligence, disclosures, or assurances that Metrokane's projections, which had been suspect throughout the negotiations process, were indeed accurate. Not doing so indicates a risk that Taylor was willing to accept.

For those reasons, the Court finds that Taylor did not prove reasonable reliance on Metrokane's misrepresentations by clear and convincing evidence. Thus, Taylor's fraud claim fails.

## I.   Willful Misconduct & Gross Negligence

A claim of gross negligence or willful misconduct requires proof of the following four elements: "(1) the existence of a duty; (2) a breach of that duty; (3) injury as a result thereof; and (4) conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing[.]" *Purchase Partners, LLC v. Carver Fed. Sav. Bank*, 914 F. Supp. 2d 480, 497 (S.D.N.Y. 2012) (internal citation and quotation marks omitted). Claims for gross negligence and willful misconduct are similar, except with regards to the fourth element. *See Coco Invs., LLC v.*

*Zamir Manager River Terrace, LLC*, 907 N.Y.S.2d 99, at *5 (N.Y. Sup. Ct. 2010). While "[g]ross negligence involves a devil-may-care attitude or indifference to duty amounting to recklessness . . . [w]illful [mis]conduct has been defined as a conscious indifference or I don't care attitude which is the prerequisite of wanton behavior[.]" *Id.* (internal citations and quotation marks omitted).

Here, Defendants had a duty to disclose the material changes in SKU and store count indicated by the 2014 program awards from Target and Walmart. Pl. Trial Ex. 148 at EUREKA0061181. Defendants did not disclose information pertaining to those material changes, thereby breaching their duty to Taylor. *Supra* pp. 24-26. The resulting injury was that Taylor paid an inflated price for Metrokane and its assets, although it is unclear how inflated that price was. JSF ¶¶ 197-99. As such, the first three elements of Taylor's gross negligence and willful misconduct claims have been satisfied. The fourth element is where the distinction lies. Although there is a slight distinction in the requisite intent required for gross negligence and willful misconduct claims, Plaintiff has satisfied their burden as to both the devil-may-care attitude accompanying the gross negligence claim, as well as the conscious indifference standard accompanying the willful misconduct claim. The Court finds that Defendants had the requisite intent to satisfy both the willful misconduct claim and the gross negligence claim. Thus, the Court reconsiders and vacates the portion of its September 30, 2019 order finding that Defendants were not liable for gross negligence.

The Court finds that Metrokane, Kane, and Grossman actively chose not to disclose information pertaining to the 2014 program awards. Metrokane received the awards prior to closing on November 12, 2013 and Kane and Grossman were aware of material changes in SKU

and store counts. JSF ¶¶ 69, 76, 98, 100; Pl. Trial Exs. 107, 138, 139. They knew that the information was pertinent, at least to some degree, to Taylor's valuation of the company, and they actively chose not to make them aware of any material changes, as they were obligated to do. Pl. Trial Ex. 148 at EUREKA0061181. Defendants' willful misconduct and gross negligence caused Plaintiff to overpay for the acquisition.

The Court is not persuaded by Defendants' suggestion that they should not be held liable for willful misconduct and/or gross negligence because, with respect to the Target award, failure to disclose the award was "at worst, a mistake." Defs.' Response to Order to Show Cause at 3, ECF No. 173. According to Defendants, Kane "reviewed the award and discovered that the award was positive as it anticipated an increase in sales," and Grossman "did not review the award pre-closing" and instead "relied on . . . Mike Girgenti [] to provide all necessary disclosures about Metrokane's relationships with its vendors." *Id.* Further, Defendants assert that Girgenti "mistakenly failed to include a disclosure about the Target award in the draft disclosure statement he sent to Mr. Grossman, which Mr. Grossman relied on in making such disclosures as part of the parties Asset Purchase Agreement." *Id.* at 3-4. With regard to the Walmart award, Defendants argue that they should not be held liable for either willful misconduct or gross negligence because Metrokane did not receive the award until after it had submitted its disclosure statement. *Id.* at 4. Nevertheless, Defendants admit that they received the Walmart award "in the days leading up to the closing of the parties' transactions." *Id.*

With regard to the Target award, the fact that Kane viewed the award as "positive" does not change the fact that she had a duty to disclose the resulting material changes to Metrokane's relationship with Target. She was aware of the award and the changes to SKU and store count

and chose not to disclose the information to Taylor. And, Grossman's testimony that he "did not review the award pre-closing" and instead relied on Girgenti to make the required disclosures, at a minimum supports a "devil-may-care attitude or indifference to duty amounting to recklessness." With regard to the Walmart award, the fact that they received the award after submitting the disclosure letter to Taylor, does not mean they were free from their duty to disclose any material changes to their relationship with Walmart prior to closing. They knew how important Metrokane's relationship with Walmart was to Taylor and they had an obligation to disclose any material changes prior to closing the transaction, even if they had already sent over the disclosure letter that would accompany the APA which at that point was not yet signed.

For those reasons, Defendants are liable for both willful misconduct and gross negligence.

## IV.    Unjust Enrichment

"To prevail on a claim for unjust enrichment under New York law, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution." *See Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (internal citations and quotation marks omitted). Under New York law, where the damages alleged in a complaint arise from the defendants' breach of a contract, the plaintiff's remedy lies in a contractual claim, but where the claim is quasi-contractual in nature, the plaintiff may bring a claim for unjust enrichment. *Friedman v. Wahrsager*, 848 F. Supp. 2d 278, 294-95 (E.D.N.Y. 2012).

Here, the Court finds that Defendants Kane and Grossman were unjustly enriched. Taylor paid an inflated purchase price for Metrokane and its assets, and the individual defendants gained

significantly from the elevated sale. JSF ¶¶ 197-99. Further, as discussed in the Court's Summary Judgment Opinion, the general rule barring unjust enrichment claims where a valid written agreement "*clearly covers* the dispute between the *parties*" is inapplicable to the case at hand. *See* SJ Op. at 63; *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987); *Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 304 (S.D.N.Y. 2006). However, because Plaintiff prevailed on its willful misconduct claim, its unjust enrichment claim is duplicative. SJ Op. at 64; *see Trainum*, 2017 WL 2377988, at *20.

## V.   Plaintiff's Current Damage Calculation is Inconsistent with the Findings of this Court

For the aforementioned reasons, Plaintiff has demonstrated the existence of damages stemming from the breach of contract via Defendants' misrepresentations. However, the significance of the breach of contract and the severity of the misrepresentations does not support the amount of damages requested by Plaintiff. The evidence indicates that Plaintiff generally knew of the struggles at Target and Walmart as well as the volatility and seasonal nature of Metrokane's products. Plaintiff conducted extensive due diligence and was a sophisticated entity. Aside from the 2014 program awards, and the information specifically relating to the decrease in SKU count at Target and Walmart, Taylor had access to virtually all metrics and data. To the extent that Plaintiff did not have access to specific data or numbers, there is no indication that they asked. This evidence, paired with the testimony from Plaintiff's less-than-persuasive damages expert, leads this Court to request further briefing on damages taking into consideration this Court's findings.

**CONCLUSION**

Having considered the testimony and evidence presented by the Parties, as well as the Parties' post-trial submissions, the Court hereby finds the following:

On Count One, breach of contract, Defendant Metrokane is found liable. On Count Two, common law fraud, Defendant Metrokane is found not liable. On Count Three, common law fraud, Defendants Kane and Grossman are found not liable. On Count Four, for willful misconduct, Defendants Metrokane, Grossman, and Kane are found liable. On Count Five, for gross negligence, Defendants Metrokane, Grossman, and Kane are found not liable. On Count Six, the Court finds that Defendants Grossman and Kane were unjustly enriched, however, due to this Court's findings, the unjust enrichment claim is duplicative.

While Plaintiff has satisfied its burden of proof in regard to the existence of damages, consideration of the evidence and the record indicates that the Court requires further briefing to determine the precise extent of those damages. The Parties are hereby **ORDERED** to provide the court with supplemental briefing not to exceed 25 pages addressing Plaintiff's damage calculations in light of this Court's findings. The Parties are hereby **ORDERED** to submit their briefs on or before April 5, 2022.

**SO ORDERED.**

**Dated:** **February 4, 2022**
**New York, New York**

**ANDREW L. CARTER, JR.**
**United States District Judge**

40