USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 10/13/23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TAYLOR PRECISION PRODUCTS, INC.,

                          **Plaintiff,**

               -against-

THE LARIMER GROUP, INC. f/k/a METROKANE, INC., JOEL GROSSMAN, AND RIKI KANE, *individually and as executrix of the will of* ROBERT LARIMER,

                          **Defendants.**

---

**15-cv-04428 (ALC)**

<u>**OPINION AND JUDGMENT**</u>

**ANDREW L. CARTER, JR., United States District Judge:**

Pending before the Court are the parties' submissions as to the calculation of damages. For the following reasons, the Court awards $4,482,208.50 in damages to Plaintiff Taylor Precision Products, Inc ("Plaintiff" or "Taylor").

## BACKGROUND

The Court assumes the readers' familiarity with the factual and procedural background of this action as set forth in this Court's Findings of Facts and Conclusion of Law ("Trial Opinion"). Trial Op., ECF No. 175. In this Court's Trial Opinion, the Court found Defendant Metrokane liable for breach of contract and Defendants Metrokane, Grossman, and Kane liable for willful misconduct and gross negligence. Trial Op., ECF No. 175. The Court also found that Defendants Kane and Grossman were unjustly enriched but that Plaintiff's unjust enrichment claim was duplicative. *Id.* at 39. The Court held that while Plaintiff demonstrated the existence of damages stemming from the breach of contract via Defendants' misrepresentations, the significance of the breach of contract and the severity of the misrepresentations did not support the damages requested by Plaintiff. *Id*. The Court requested further briefing on damages taking into considerations this Court's findings. *Id*. On May 19, 2022, the parties submitted their post-trial briefs. *See* ECF Nos. 178-179. On April 13,

2023, the parties filed a letter requesting the Court issue its opinion regarding damages. ECF No. 180.

## I. This Court's Previous Findings

As stated in this Court's Summary Judgment Opinion and Trial Opinion, in the context of a New York breach of contract claim, "[a] party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc*., 500 F.3d 171, 185 (2d Cir. 2007) (citation omitted); SJ Op. at 68; Trial Op. at 26. Plaintiff, here is "entitled to the benefit of its bargain, measured as the difference between the value of [the company it purchased] as warranted by [Seller] and its true value at the time of the transaction." Trial Op. at 26 (citing *Merrill Lynch*, 500 F.3d at 185 (citations omitted)).

The Court held that "because 'contract damages are measured at the time of the breach,' inquiry into the performance of Metrokane's assets and 'market conditions in the months following the acquisition' is improper, as events subsequent to the breach 'may neither offset nor enhance [Buyer's] general damages.'" *Id*. at 26-27 (quoting *Merrill Lynch*, 500 F.3d at 185). "Moreover, '[s]uch damages are general rather than consequential and therefore the plaintiff is required to show with reasonable certainty the fact of damage, not its amount.'" *Id*. at 27 (quoting *Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 220 (S.D.N.Y. 2010))

The Court held that Plaintiff has proven the fact of damages, but that Plaintiff failed to provide a "reasonable estimate" of damages, particularly in light of the Court's ultimate findings. *Id*. at 27 (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007)). Specifically, "Taylor has not demonstrated 'the position it would have occupied had the

2

contract been fulfilled according to its terms.'" *Id*. (quoting *Merrill Lynch*, 500 F.3d at 185). Plaintiff proved that Defendants' failure to disclose material changes in their relationships with Walmart and Target caused it to pay an inflated price for Metrokane because the state of these relationships was not what it seemed. *Id*. However, the Court found that a "question still remains as to how inflated that price was." *Id*. The Court also explained that "New York courts have significant flexibility in estimating general damages once the fact of liability is established." *Id*. (quoting *Tractebel*, 487 F.3d at 112).

The Court found that the testimony and arguments relating to the valuation of Metrokane and its assets was unclear. *Id*. at 21. The Court did find, however, that Taylor itself relied on their own adjusted and projected growth rates—numbers calculated using Metrokane's trailing twelve month ("TTM") adjusted EBITDA[1] and a purchase price multiple. *Id*. Taylor and Centre constantly calculated the adjusted EBITDA and identified an implied purchase price multiple in an effort to predict Metrokane's future value and cash flow. *Id*.

## II.     Plaintiff's Damages Calculation

Plaintiff's damages calculation at trial amounted to $16.7 million. ECF No. 167 at 7. Plaintiff now requests that the Court award damages to Plaintiff based on Defendants' breach of conduct, willful misconduct and gross negligence of not less than $8.07 million. Pl's Br., ECF No. 179 at 16.

Plaintiff points to the damage analysis reflected in the report and testimony of its expert Justin McLean. Plaintiff asserts that the information contained in the 2014 Target and Walmart awards include (1) the EBITDA associated with the lost 2014 SKUs and (2) the "decreased growth

---

[1] "EBITDA is 'earnings before interest, taxes, depreciation, and amortization,' and is 'used as an indicator of a company's profitability and ability to service its debt.'" *In re Lehman Bros. Holdings Inc*., 544 B.R. 62, 68 n.9 (Bankr. S.D.N.Y. 2015) (quoting Black's Law Dictionary (10th ed. 2014)).

3

prospects for the Business overall due to the sharp contraction of business these awards portended." *Id*. at 9. Second, Plaintiff contends its damages analysis "is equivalent to valuing the Business at the time of closing taking into account the information contained in the awards and subtracting th[at] value from the purchase price [$69.5 million] Taylor actually paid." Pl's. Br. at 9. Plaintiff's request for $8.07 million derives from a damages analysis consisting of "two components." *Id*. at 10.

### A. First Component

The first component is the "damage associated with the precise impact of the lost SKUs[2] going forward in the amount of lost adjusted EBITDA." *Id*. at 13. Plaintiff describes how its expert calculated the diminution in value of the Business associated with the specific SKUs dropped in the 2014 awards. *Id*. at 10. Plaintiff explains that its expert isolated the cash flows associated with these SKUs in the prior year and then derived their TTM adjusted EBITDA, which equaled $593,670.00.[3] *Id*. at 10. Plaintiff then applied the purchase price multiple of 7.55x[4] to this TTM EBITDA amount to "reflect the ongoing nature of this loss," which Plaintiff concludes is $4.5 million.[5] *Id*. As explained by Plaintiff's expert in his report, this $4.5 million calculation is "associated with a permanent loss in sales" in connection with the SKUs at issue. McLean Expert Report, Pl's Trial Ex. 172, ECF No. 139-92 ¶ 3. Plaintiff argues that once a SKU is cut, it is lost for that program year

---

[2] The Court explains the definition of SKUs and the background of the 2014 SKU awards at issue in its Trial Opinion. *See* Trial Op., ECF No. 175 at 7-8, 11-13.

[3] Plaintiff's expert calculated this EBITDA by calculating the gross profits of each of the SKUs removed between 2013 and 2014 by Target and Walmart using sales from the year before (10/1/2012 - 9/30/2013). *See* Exs. 6-9 to McLean Expert Report, Pl's Trial Ex. 172, ECF No. 139-92.

[4] Plaintiff explains that the purchase price multiple of 7.55x was derived from the purchase price of $69.5 million and the TTM-adjusted EBITDA "most reliable at closing of $9.2 million." Pl's Br. at 10 n.6. (69.5 divided by 9.2 equals 7.55).

[5] $593,670 x 7.55 = $4,482,208.50.

with no expectation that it will be regained, and therefore the 2014 awards are a "snapshot of the state of the Business at that point in time and cannot be thought of as temporary." Pl's Br. at 10.

### B. Second Component

The second component is Plaintiff's calculation of the "reduction in the overall growth of the Business associated with the contracting Target and Walmart relationships" as revealed by the awards decreasing the number of SKUs. *Id*. at 11. Plaintiff's expert calculated this by "adjusting the purchase price multiple implied in the deal of 7.55x downward for the remaining amount of the purchase price (i.e., 69.5 million minus the TTM EBITDA associated with the lost SKUs)." *Id*. Plaintiff explains that because the multiple is a mathematical representation of the growth and discount rates applied to cash flows, its decrease represents assumptions of lower growth. *Id*. Plaintiff cites to the deal model Taylor created (which was the debt financing model that it prepared for and shared with its lenders) and explains that the model reflected expected Business growth of 2% annually. *Id.* Because at the time of the negotiations in 2013, Target and Walmart were responsible for over 50% of the Business' growth, Plaintiff's expert associated a loss of 1% expected annual growth with the "contracting Target and Walmart relationships." *Id*. Plaintiff's expert then "derived the decrease in purchase price multiple from this level of expected growth reduction and multiplied it by the remaining purchase price to yield an additional $6.8 million[6] in damages." *Id*.[7]

---

[6] ($9.20 million - $593,670) × 0.79 = $6,799,000.07. According to Plaintiff, the table provided in their expert report and brief shows that given an EBITDA multiple of 7.55, a reduction in long term EBITDA growth of 1.0 percent would decrease the earnings multiple by 0.79, from 7.55 to 6.76. *See* Pl's Br. at 16, Tbl. 1.

[7] Plaintiff argues that by applying a 2% annual growth reduction yielded an additional $12.3 million in damages. Pl's Br. at 11.

Plaintiff argues that the second component of their damages request "takes into account the impact on the Business' overall growth prospects given that Target and Walmart were the major components of actual and expected growth." *Id*. at 14. Plaintiff additionally argues that "without a component of damages correlating to reduced growth, the damages awarded here will not reflect that the reduction in items to be sold at Target and Walmart also impacted the sales of remaining items due to the fact that customers are drawn to larger brand displays and like to buy items within the same brand." *Id*.

Plaintiff presents and offers its expert's "flexible analysis structure" so the Court can calculate an award of damages in line with the Court's previous findings. *Id*. at 15. Plaintiff argues that the more Taylor understood about the declining Target and Walmart relationships, the lower its growth expectation for the Business should have been. Therefore, Plaintiff suggests that the Court could use a change in growth rate of 0.5%, rather than 1 to 2%, to represent the higher risk Taylor took on. *Id*. at 15. A 0.5% growth rate reduction would decrease the earnings multiple by 0.41, from 7.55 to 7.14. See Pl's Br. at 16, Tbl. 1. Therefore, the calculation used by Plaintiff was as follows: (9.2 million - $593,670) x .41. This equals approximately $3.5 million[8] in lost value to Taylor. Adding this to the approximately $4.5 million in damages mentioned previously would yield a total damages amount of $8.07 million.

Defendants, on the other hand, argue that Plaintiff failed to meet its burden at trial of providing the Court with any acceptable, stable, or rational damages calculation upon which the Court could award damages and that, therefore, the Court should issue judgment in favor of

---

[8] According to Plaintiff, the table provided in their expert report and brief shows that every 0.5 increment in growth rate (up or down from 7.55x) yields a constant .41x change in multiple. That becomes the new downward change applied to the remainder of the purchase price. Pl's Br. at 16.
(9.2 million - $593,670) x .41 = $3,528,595.30.

Defendants. Defs.' Br., ECF No. 178 at 19. Defendants contend that Plaintiff's damages calculation did not present any acceptable valuation methodology that provides a value of Metrokane on the day of closing, or alternatively that the damages calculation is an improper lost profits calculation. *Id*. at 2, 7-9, 15-16. Separately, Defendants also argue that the Court "essentially held" that Plaintiff paid the very same price for Metrokane that Metrokane was worth on the day of closing and therefore Plaintiff did not pay an inflated price for Metrokane. Id. at 3, 16-19.

## DISCUSSION

Under New York law, there are two categories of damages for a breach of contract: "general damages . . . recover the value of the very performance promised, whereas consequential damages seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 618 F. Supp. 2d 280, 292 (S.D.N.Y. 2009) (cleaned up) (citing *Schonfeld v. Hilliard*, 218 F.3d 164, 175-76 (2d Cir. 2000)). "The buyer of a business bringing a breach of contract claim is entitled to be put in the position they would have occupied had the seller's representations and warranties been true" and "[s]uch damages are 'general rather than consequential . . . .'" *Koch Indus*., 727 F. Supp. 2d at 220 (quoting *Merrill Lynch*, 500 F.3d at 185); *see also Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 480 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) ("General damages are the natural and probable consequence of the breach of a contract.") (citations omitted).

General damages require a "less demanding standard." *Optima Media Grp. Ltd. v. Bloomberg L.P.*, No. 17-CV-01898 (AJN), 2021 WL 1941878, at *18 (S.D.N.Y. May 14, 2021). "Once the fact of damages has been established, New York courts ordinarily will not deny recovery

7

merely because the amount of such damages is uncertain." *Id*. (citing *Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977)). As explained by the Second Circuit, "[a] person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain." *Tractebel*, 487 F.3d at 110. "The plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach." *Id*. at 110–11 (cleaned up) (citing *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 314 N.E.2d 419, 421 (1974)). "Such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection." *Id*. (quoting *Entis v. Atl. Wire & Cable Corp.*, 335 F.2d 759, 763 (2d Cir.1964)). "At that point, the burden of any uncertainty as to the amount of damages is on the breaching party." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016).

However, it is still the "Plaintiffs' burden to provide the Court with a reasonable means of and basis for calculating damages." *Esquire Trade & Fin., Inc. v. CBQ, Inc.*, No. 03 CIV. 9650 (SC), 2009 WL 3756470, at *4 (S.D.N.Y. Nov. 5, 2009) (citing *Mehta v. New York City Dep't of Consumer Affairs*, 556 N.Y.S.2d 601, 602 (N.Y.App. Div. 1st Dep't 1990)). "Establishing a 'stable foundation for a reasonable estimate' requires putting forth a plausible theory that amounts to something more than a speculative measure of damages." *Cottam v. Glob. Emerging Cap. Grp., LLC*, No. 16 CIV. 4584 (LGS), 2021 WL 1222120, at *5 (S.D.N.Y. Mar. 31, 2021), *aff'd sub nom. Cottam v. 6D Glob. Techs., Inc.*, No. 21-1031-CV, 2022 WL 16908708 (2d Cir. Nov. 14, 2022) (quoting *Freund*, 314 N.E.2d at 421. "If a plaintiff does not provide a stable foundation for a reasonable estimate, then the claim falls for uncertainty." *Optima Media Grp.*, 2021 WL 1941878, at *18 (cleaned up) (citing *Holland Loader Co., LLC*, 313 F. Supp. 3d at 481 and collecting cases). In that event, the plaintiff

may only recover nominal damages, which are ordinarily awarded in the amount of one dollar. *Id*. (citing *Washington v. Kellwood Co.*, 714 F. App'x 35, 42 (2d Cir. 2017)).

As an initial matter, it appears that Defendants seek to re-litigate whether Plaintiff satisfied its burden of proof with regard to the existence of damages. *See* Defs.' Br. at 3, 16-19. The Court has already decided this issue and sees no reason to reconsider its decision. *See* Tr. Op. at 27 ("The Court finds that Plaintiff has proven the fact of damage"; "Plaintiff has proved that Defendants' failure to disclose material changes in their relationships with Walmart and Target caused it to pay an inflated price for Metrokane . . ."). As explained above, the question is what the inflated price was, not whether there was an inflated price at all.

The Court finds Plaintiff has partially met its burden of providing the Court with a reasonable means of and basis for calculating damages. As explained in *Celebrity Cruises,* "the three methods" for a valuation analysis "most accepted, both in the business valuation literature and the cases are (1) discounted cash flow analysis, or DCF; (2) the "market comparables" or "guideline companies" approach; and (3) the "acquisitions" method." *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 179 (S.D.N.Y. 2006) (cleaned up) (citing *Peltz v. Hatten*, 279 B.R. 710, 737–38 (D. Del. 2002)). The DCF or discounted income method "involves projections of future cash flows (which are largely dependent on judgments and assumptions about a company's growth rate) and judgments about liquidity and the cost of capital." *Id*. (quoting *Peltz*, 279 B.R. at 738.) The Court finds the Plaintiff has adopted a discounted income approach in valuing the business.

Additionally, "in order to determine the amount of damages arising from a breach or a misrepresentation, it is necessary to isolate the effects of the breach or misrepresentation." *Meda AB*, 969 F. Supp. 2d at 389. As to Plaintiff's first component, Plaintiff has isolated the effects of the

9

breach by calculating the TTM adjusted EBITDA ($593,670.00) of the lost SKUs and subtracting that from the TTM EBITDA and applying the purchase price multiple of 7.55x, which itself is derived from the original purchase price of $69.5 million. This calculation is directly tied to the information concealed by Defendants and speaks to the valuation of the business on the day of closing. With respect to the first component of damages calculation, the Court believes Plaintiff has satisfied its burden of providing the Court with a reasonable means of and basis for calculating damages.

However, the Court finds the second component of Plaintiff's damage calculation to be speculative in nature. "While the law does not require damages to be calculated with mathematical precision, they must be capable of measurement based on known reliable factors without undue speculation." *Esquire Trade & Fin., Inc.*, 2009 WL 3756470, at *4. Here, Plaintiff asks the Court to pick a number between 0.5% and 2% to "represent the higher risk" Taylor knowingly took on and plug it into a formula provided by Plaintiff's expert. Pl's Br. at 15. According to Plaintiff, its damages here ranged from $3.6 million to $12.3 million. While the Court acknowledges that it is "reasonably certain" that Plaintiff would have lowered its growth expectation for the Business had it known of the lost SKUs, Plaintiff has not provided a "stable foundation for a reasonable estimate" of such damages as required by New York law. *Tractebel*, 487 F.3d at 110-11; *see Meda AB*, 969 F. Supp. 2d at 389 ("this model is not helpful to the Court unless there is some way of reliably ascertaining how much less, if at all, [Plaintiff] would have projected the [Defendant's] future EBITDA in a world of full disclosure.").

Therefore, the Court will only consider the "first component" of Plaintiff's damages calculation. Plaintiff is awarded $4,482,208.50 in damages.

## CONCLUSION

Plaintiff is awarded $4,482,208.50 in damages. The Clerk of the Court is respectfully directed to enter judgment in favor of Plaintiff against Defendants and to terminate this case.

**SO ORDERED.**

Dated:   **October 13, 2023**
         **New York, New York**

*[signature]*

**ANDREW L. CARTER, JR.**
**United States District Judge**